UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>v.<br><br>JUSTIN ANTHONY FISHER and JOSHUA RAY FISHER,<br><br>          Defendants. | Case No. 2:17-cr-00073-APG-GWF<br><br>**FINDINGS AND RECOMMENDATION**<br><br>**Re:  Motion to Suppress (ECF No. 117)** |

   This matter is before the Court on Defendants Justin Anthony Fisher's and Joshua Ray Fisher's Motion to Suppress Evidence Derived from Execution of Search Warrant and/or "Consent to Search" (ECF No. 117), filed on November 7, 2018.  The Government filed its Response (ECF No. 119) on November 20, 2018, and Defendants filed their Reply (ECF No. 121) on November 29, 2018.  The Court conducted a hearing in this matter on December 10, 2018.

## BACKGROUND

   Defendants Justin Fisher and Joshua Fisher are charged in a superseding indictment filed on November 28, 2017 with conspiracy to commit sexual exploitation of children, sexual exploitation of children, distribution, receipt and possession of child pornography, and coercion and enticement.  *Superseding Criminal Indictment* (ECF No. 61).  The instant motion to suppress concerns the search of Defendant Justin Fisher's former residence located at 10432 Burkehaven Avenue, Las Vegas, Nevada on July 12, 2018.  That search was conducted with the consent of the owner of the residence and resulted in the discovery of a black cellular telephone and two

1

SSD drives in the attic crawl space of the residence. The FBI obtained a search warrant on July 18, 2018 to search the cellular telephone and SSD drives for evidence relating to the charges in the superseding indictment. Defendants seek to suppress the evidence obtained from the cellular phone and SSD drives on the ground it constitutes the "poisonous fruits" from a prior unlawful search of the same residence on November 21, 2016.

The circumstances relating to Defendants' motion to suppress evidence obtained during the November 21, 2016 search are set forth in Order (EFC No. 59) which granted Defendants' request for a *Franks* evidentiary hearing. That search was conducted pursuant to a search warrant that authorized the police to seize "[a]ny data evidence of visual depictions/representations (images and videos) that depict minors (real or animated) in an erotic, sensual or sexual manner." It also authorized the seizure of visual depictions that constitute child pornography as defined in 18 U.S.C. § 2256(8). The affidavit in support of the warrant was based on information that was received by the National Center for Missing and Exploited Children (NCMEC) from Tumblr regarding the possible transmission of child pornography. NCMEC forwarded the information to the Las Vegas Metropolitan Police Department which subsequently obtained and served a search warrant on Tumblr. Tumblr's response to the search warrant disclosed that child pornography images had potentially been transmitted from two IP addresses, 50.118.198.254 located in San Jose, California, and 24.253.48.163 located in Las Vegas, Nevada. The latter IP address resolved to Defendant Justin Fisher and the residential address at 10432 Burkehaven Avenue, Las Vegas, Nevada. Based on the information originally provided by Tumblr and that provided in its response to the search warrant, a Clark County, Nevada Justice-of-the-Peace issued the warrant to search the Burkehaven residence.

This Court found that Defendant Justin Fisher had made a sufficient threshold showing that the November 16, 2016 search warrant affidavit contained material misrepresentations or omissions to justify an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674 (1978). The Court made no finding, however, that any alleged misrepresentations or omissions in the affidavit were intentionally or recklessly made since that determination is reserved for the evidentiary hearing. The evidentiary hearing was originally

scheduled for December 18, 2017. The parties have stipulated to continue the hearing several times since that date.

As set forth in the July 18, 2018 affidavit of FBI Special Agent Flaherty, a copy of which is attached to Defendants' Motion to Suppress (ECF No. 117) (hereinafter "*Flaherty Affidavit*"), during the November 21, 2016 search of the residence at 10432 Burkehaven Avenue, law enforcement officers encountered Defendant Joshua Fisher and seized a Samsung cellular telephone from him. The officers also seized numerous computer towers, laptops, hard drives, thumb drives and cell phones found in the residence. *Flaherty Affidavit*, at ¶ 44. During a forensic search of the electronic devices seized from the residence, officers discovered over 30 files of child pornography. They also discovered images of a nude adult male lying in bed with a nude juvenile female. Additional evidence led the officers to the identity of the juvenile female who resided in Oklahoma City, Oklahoma. The juvenile female was interviewed and stated that she went to a motel with Defendant Justin Fisher where they photographed themselves nude together. Other evidence showed that Justin Fisher rented a motel room in Oklahoma City at or about the time of the juvenile female's contact with him. *Id.* at ¶¶ 46-48. Child pornography was also found on a computer tower allegedly belonging to Justin Fisher. *Id.* at ¶ 55.

The officers obtained a warrant to search the Samsung cellular telephone seized from Joshua Fisher on November 21, 2016. *Id.* at ¶ 45. During the search of that device, officers found numerous images/videos of another juvenile female who had taken nude photographs of herself which she sent to Joshua Fisher. *Id.* at ¶ 53. The officers also discovered numerous cell phone chat messages between Justin Fisher and Joshua Fisher in which they discussed engaging in sexual acts with the two juvenile females. *Id.* at ¶ 56.

In April 2017, federal law enforcement agents obtained and executed a second search warrant for the premises at 10432 Burkehaven Avenue during which they seized additional computer towers, laptops, hard drives, thumb drives, and cell phones. As of July 18, 2018, a forensic search of those devices had not been completed. *Id.* at ¶¶ 64-65.

Following the arrest and detention of Defendants Justin Fisher and Joshua Fisher in February and April 2017, respectively, the Government obtained an order which precluded them

from having direct contact with each other except in the presence of their attorneys.[1] On June 20, 2017, Defendant Joshua Fisher telephoned another brother, identified as "E," and arranged to patch Justin Fisher into the call so that all three brothers could speak together. During that telephone call, Justin Fisher instructed "E" "to remove something secret from the Burkehaven residence" when no one else was around and when Defendants' wives were not at home. Justin Fisher "explained the importance of removing this item before selling the Burkehaven residence." He stated that he knew the item was still within the residence "because it was not listed on 'mine,' presumeably referring to the property receipt left at the residence at the conclusion of the search warrant having been executed and included in the discovery which the brothers had just been discussing." Justin Fisher indicated that the item was hidden "in the hall, up high." During the telephone call, Joshua Fisher "kept trying to assure Justin Fisher that he had taken care of it, but the brothers agreed that "E" should still look for the item." *Id.* at ¶ 66.

On July 12, 2017, Joshua Fisher spoke with "E" by telephone. "E" asked Joshua Fisher if the item was located in the closet. Joshua Fisher stated that it was not. He stated that "you were going to replace my filters," and that the Burkehaven residence had multiple filters. "E" replied that he would" have to get a ladder out today." *Id.* at ¶ 67. Joshua Fisher again spoke with "E" on July 18, 2017. He asked "E" if he got "that thing done at my pad?" "E" replied that he had not yet gone over there. Joshua Fisher stated: "Alright . . . the problem is that Kimberly has to hand over keys to the estate sale lady soon . . . so you know?" The two then exchanged statements about "E" checking the filters in the closet. *Id.* at ¶ 68.

In September 2017, Officer Miller, who was the affiant for the November 16, 2016 search warrant, and FBI Agent Flaherty contacted "E" and asked him about his telephone

---

[1] A criminal complaint was filed against Justin Anthony Fisher on February 14, 2017. *See* United States v. Justin Anthony Fisher, Case No. 2:17-mj-00133-CWH, *Complaint* (ECF No. 1). Justin Fisher's initial appearance on the complaint occurred on February 15, 2017, at which he was ordered detained pending trial. *Id.*, *Minutes of Proceedings* (ECF No. 4); *Order of Detention* (ECF No. 9). Joshua Ray Fisher was charged in a criminal complaint filed on April 4, 2017. *See* United States v. Joshua Ray Fisher, Case No. 2:17-mj-00271-GWF-1, *Complaint* (ECF No. 1). His initial appearance occurred on April 7, 2017, at which he was also ordered detained pending trial. *Id.*, *Minutes of Proceedings* (ECF No. 8); *Order of Detention* (ECF No. 13).

4

1  conversations with Justin and Joshua Fisher and what item he had removed from the Burkehaven
2  residence. "E" told the officers that he had gone to the residence and "looked in the upstairs attic
3  crawl space, but was unable to locate any item." *Id.* at ¶ 70.

4  On or about September 15, 2017, the Burkehaven residence was sold to a new owner. *Id.*
5  at ¶ 71. On July 9, 2018, the owner of the residence, referred to as "T," went to the Las Vegas
6  office of the FBI. "T" told the FBI that he had been informed by neighbors that law enforcement
7  had previously executed search warrants at his residence and that the previous owners were child
8  sexual predators. "T" was concerned about the prior owners as he had children. "T's" contact
9  information was obtained by the FBI and provided to Officer Miller. *Id.*

10  On July 12, 2018, Officer Miller contacted "T" at his residence. Officer Miller informed
11  "T" of the circumstances discussed in the telephone calls between the Defendants. Officer
12  Miller asked for "T's" consent to search the upstairs attic crawl space for any items that might
13  have been left in the residence. "T" consented to the requested search and executed a written
14  consent to search form. Officer Miller then accessed the attic crawl space and searched the
15  immediate area. He found a black cellular telephone and two portable SSD drives that were
16  concealed between the insulation and the wood framing. "T" stated that he did not know about
17  the location of these items or have any ownership of them. Officer Miller removed the items and
18  placed them in FBI evidence. *Id.* at ¶ 72.

19  Agent Flaherty stated that "[b]ased on the fact that [Defendants] did not retrieve the
20  [items] prior to the sale of the Burkehaven Avenue residence knowing that "E" had not located
21  the [items], Affiant believes that [Defendants] have abandoned the [items] and relinquished any
22  possessory or privacy rights in the [items]. *See United States v. Anderson*, 663 F.2d 934, 938
23  (9th Cir. 1981). Additionally, the new owner of the property "T" has given the Government
24  consent to seize and search the [items]. However, Affiant seeks this search warrant out of an
25  abundance of caution." *Id.* at ¶ 75. The Court authorized the search of the cell phone and SSD
26  drives. As a result of the searches of those items, the Government has reportedly discovered
27  additional evidence supporting the charges against the Defendants.
28  . . .

**DISCUSSION**

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and persons or things to be seized." The basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials. *Carpenter v. United States*, --- U.S. ---, 138 S.Ct. 2206, 2213 (2018). *Carpenter* further states:

> For much of our history, Fourth Amendment search doctrine was "tied to common-law trespass" and focused on whether the Government "obtains information by physically intruding on a constitutionally protected area." *United States v. Jones*, 565 U.S. 400, 405, 406 n. 3, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012)). More recently, the Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook County*, 506 U.S. 56, 64, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992)). In *Katz v. United States*, 389 U.S. 347, 351, 889 S.Ct. 507, 19 L.Ed.2d 576 (1967), we established that "the Fourth Amendment protects people, not places," and expanded our conception of the Amendment to protect certain expectations of privacy as well. When an individual 'seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith*, 442 U.S. at 740, 99 S.Ct. 2577 (internal quotation marks omitted).

*Id.*

An individual has "standing" to challenge a search under the Fourth Amendment, if he has a reasonable expectation of privacy in the place or thing searched. *Rakas v. Illinois*, 439 U.S. 128, 138-140, 99 S.Ct. 421, 427-429 (1978); *United States v. Ziegler*, 474 F.3d 1184, 1189 (9th Cir. 2007). "This expectation is established where the claimant can show: (1) a subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy." The defendant has the burden of proving both elements. *Ziegler*, at 1189 (citing *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005)). *See also United States v. Lopez-Cruz*, 730 F.3d 803, 807 (9th Cir. 2013). Factors to be considered in determining whether an individual has a reasonable expectation of privacy include, but are not limited to, "whether the defendant has a property or

6

possessory interest in the thing seized or the place searched, whether he has a right to exclude others from that place [or the thing seized], whether he has exhibited a subjective expectation of privacy that it would remain free from governmental intrusion, whether he took normal precautions to maintain privacy, and whether he was legitimately on the premises [or legitimately in possession of the thing seized]." *United States v. Lopez-Cruz*, 730 F.3d at 808 (quoting *United States v. Finley*, 477 F.3d 250, 258-59 (5th Cir. 2007)).

An individual generally does not have a legitimate expectation of privacy in another person's house unless he is, at minimum, staying there as an overnight guest. *Minnesota v. Carter*, 525 U.S. 83, 89, 119 S.Ct. 469, 473 (1998); *United States v. Gamez-Orduno*, 235 F.3d 453, 458 (9th Cir. 2000). In this case, Justin and Joshua Fisher had no possessory interest in the Burkehaven house after it was sold and occupancy was transferred to the new owner in or about September 2017.[2] Because the Defendants had no legitimate expectation of privacy in the house after that date, they cannot challenge the lawfulness of a subsequent search of the house.

### 1. Whether Defendants abandoned the items found in the attic space such that the alleged illegality of the November 21, 2016 search does not bar introduction of the evidence obtain from the subsequent search of the items.

The Government argues that Defendants abandoned the items concealed in the attic after the house was sold and occupied by the new owner, and that they do not have standing to challenge the Government's search of those items. "The proper test for abandonment is not whether all formal property rights have been relinquished, but whether the complaining party retains a reasonable expectation of privacy in the articles alleged to be abandoned." *United States v. Wilson*, 472 F.2d 901, 902-03 (9th 1973) (citing *Katz v. United States*, 389 U.S. at, 351, 88 S.Ct. 507). "The touchstone of 'abandonment is a question of intent[.]'" *United States v. Lopez-Cruz*, 730 F.3d at 808 (quoting *United States v. Nordling,* 804 F.2d 1466, 1469 (9th Cir. 1986)). "We conduct a 'totality of the circumstances' inquiry that 'focus[es] on whether, through words, acts or other objective indications, a person has relinquished a reasonable

---

[2] It is the Court's understanding that Burkehaven residence was owned by Defendant Justin Fisher and that he resided there prior to his detention. Defendant Joshua Fisher resided elsewhere, although he arguably had a privacy interest in items located in his brother's residence.

7

expectation of privacy in the property at the time of the search or seizure.'" *Id*. Although a person has the burden of establishing that he had a reasonable expectation of privacy in the subject property, the government has the burden of proving by a preponderance of the evidence that he abandoned the property. *United States v. Basinski*, 226 F.3d 829, 836 (7th Cir. 2000); *United States v. Biddle*, 2010 WL 11530869, at *4 (N.D.Cal. July 8, 2010) (reversed in part on other grounds in *United States v. Biddle*, 467 Fed.Appx. 693 (9th Cir. Jan. 10, 2012)).

In *Wilson*, the defendant was more than two weeks late in paying his apartment rent. The landlord asked neighbors about defendant's whereabouts and learned that he had moved out and it was uncertain whether he would return. The landlord therefore decided to repossess. When he went to the apartment, he found the door open and the unit in disarray. He also observed pipe bombs, blasting powder and impact fuses inside the apartment. Based on these facts, the court held that defendant had abandoned his possessory interest in the apartment and its contents and had no reasonable expectation of privacy in the premises or the property he left behind. *Id.*, 472 F.2d at 903.

In *United States v. Zacherle*, 689 Fed.Appx. 467 (9th Cir. April 20, 2017) (unpublished decision), the defendant moved to suppress evidence of child pornography found on his personal computer. In affirming the denial of the motion, the court stated:

> Zacherle left this laptop in Marianne Mosqueda's bedroom for three months without any instruction as to what she was to do with it and did not tell her anything about his whereabouts. That he was incarcerated during this absence is not dispositive. Zacherle could have asserted control over the laptop. He sent his mother to collect his pickup from Mosqueda's home. Moreover, he was simply a guest in Mosqueda's home. He paid no rent or bills and performed only modest chores in exchange for room and board. He could not reasonably expect Mosqueda to store his belongings for months without any request from him to do so. Her decision to rid herself of Zacherle's computer by giving it to his estranged sister—who subsequently gave it to law enforcement—did not violate Zacherle's Fourth Amendment rights. *See United States v. Wilson*, 472 F.2d 901, 902 (9th Cir. 1972) ("Search or seizure of abandoned property, even without a warrant, is simply not unreasonable.").
>
> To the degree Zacherle argues the files on his computer were entitled to greater protection than the computer itself, we are not persuaded. Zacherle abandoned his computer, and he exhibited no greater concern for the files it contained. There is no evidence suggesting the files were locked. Rather, he left his

>unlocked computer with unlocked files in a guest bedroom for months without any attempt to exert control over the computer or files in which he now asserts a privacy expectation. It may be that Zacherle thought there was no need to protect his files or computer from Mosqueda, his estranged sister or even law enforcement because he was confident all evidence of his wrongdoing was deleted by the file-eraser-software FBI agents later found on his computer. That he did not possess the "technical savvy" to understand deleted files could be recovered with the right tools does not give him the right to assert an expectation of privacy he previously abandoned. *United States v. Borowy*, 595 F.3d 1045, 1048 (9th Cir. 2010) (quoting *United States v. Ganoe*, 538 F.3d 1117, 1127 (9th Cir. 2008)).

*Id.* at *468-69.

In *United States v. Basinski*, 226 F.3d at 836-39, the court held that defendant did not abandon his reasonable expectation of privacy in the contents of a briefcase that he entrusted to a long-time friend to hide on his rural property. The defendant later instructed the friend to burn the briefcase and contents so that it could not be seized by the FBI. The friend, however, turned the briefcase over to the FBI when they came inquiring about it. In *United States v. Nowak*, 825 F.3d 946, 949 (8th Cir. 2016), however, the court held that defendant abandoned a backpack that he left in a friend's automobile after it was stopped, and defendant fled from the scene. The fact that the backpack was left in a friend's private vehicle, rather than a public place did not preclude a finding of abandonment.

In *United States v. Sparks*, 806 F.3d 1323 (11th Cir. 2015), the defendants inadvertently left their cell phone, which contained images of child pornography, at a Walmart store. The defendants learned that a Walmart employee had found the phone and they arranged to meet with her to recover it. Prior to the meeting, the employee discovered that the phone contained images of child pornography. She therefore did not show up for the meeting with the defendants. Instead, she gave the phone to her fiancé who delivered it to the police. After the Walmart employee failed to appear for the meeting, the defendants did not return to the Walmart store to look for her. Nor did they ask for Walmart's assistance in obtaining their phone or file a report with Walmart or the police complaining that the employee had not returned their phone. "Instead, they made a conscious decision to stop pursuing the phone, even though they knew how to get it back with reasonable effort." *Id.* at 1329. In addition, within a few days after losing the phone, the male defendant purchased an upgraded phone for himself, filed an

9

insurance claim for the lost phone, and obtained a replacement phone for the female defendant. *Id.* at 1343.

The Eleventh Circuit noted that it has held that a person who ditches property during a chase with law enforcement abandons that property and lacks standing to challenge its seizure. Similarly, "a person who makes a decision to leave his property containing contraband when law enforcement approaches or seeks to examine the property likewise abandons the property and loses standing to challenge its seizure." 806 F.3d at 1342. The court noted that it found abandonment in a case where the defendants were rescued by the Coast Guard from a sinking vessel, which was then boarded by officers who found illegal drugs onboard. *Id.* In the case before it, the court affirmed that the defendants "initially maintained a possessory interest in the cell phone when it was lost." *Id.* at 1343. However, after the employee failed to appear for the meeting, the defendants made no further attempts to recover it. "This decision to stop pursuing the phone, in the face of reasonable alternatives available to obtain the return of the phone, when [defendants] knew where it was and how to get it back, stands in stark contrast to their urgent efforts to retrieve the phone in the period immediately after the phone was lost." *Id.* Based on all of the circumstances, the court held that defendants abandoned the phone prior to its being searched by the police.

In *United States v. Quashie*, 162 F.Supp.3d 135 (E.D.N.Y. 2016), a robber dropped a cellphone in an apartment during the course of the robbery. The robbers later returned in an attempt to recover the cellphone, but were unable to reenter the apartment. A few hours later, the victim found the cellphone and turned it over to the police. The police were able to identify the defendant from information contained in the phone which they searched without a warrant. In holding that the cellphone had been abandoned, the court stated: "By leaving the phone behind in the apartment, the robbers did not protect the property and did not evince an intent to maintain an expectation of privacy in it. Even if the robbers did not intentionally abandon the phone when they first left the apartment, they returned to the scene of the crime to retrieve it, and found the door locked. At that point, the robbers voluntarily abandoned the phone and left the crime scene, rather than risk getting caught." *Id.* at 141.

The foregoing cases are instructive as to how the abandonment doctrine is applied. However, each case must be decided on its own particular facts. The evidence in this case indicates that the cell phone and the SSD drives were concealed in the attic space of the Burkehaven house prior to the November 21, 2016 search. The Government argues that Defendants could have taken steps to remove the concealed items from the residence before they were detained in February and April 2017, but that they failed to do so. It also argues that Defendants failed to take steps to remove the items prior to June 20, 2017. These facts, however, do not support a finding of abandonment. Although detained, Justin Fisher, and perhaps also Joshua Fisher, still maintained possessory control over the house and its contents. The fact that they left the items concealed in the attic prior to the sale of the property does not evidence an intent to abandon them.

On June 20, 2017, however, Defendant Justin Fisher instructed "E" to remove the items from the house before it was sold. Defendant Joshua Fisher further communicated with "E" on July 12 and 18, 2017 as to whether he had found and removed the items. *Flaherty Affidavit*, at ¶ 66. The coded or guarded language used by Defendants during these telephone calls indicates that they were aware that the calls were possibly being intercepted by law enforcement. Defendants' effort to have "E" remove the items from the attic was obviously unsuccessful. It is not clear, however, whether Defendants were informed prior to the sale of property that "E" did not find the items or whether he believed that the items were not in the attic.[3] In any event, Defendants made no further effort to recover the items after the house was sold and was in possession of a new owner with whom Defendants had no relationship. The items remained in the attic for another nine months until the new owner "T" contacted the FBI in July 2018 and Officer Miller obtained his permission to search the attic. During that period, Defendants could have attempted to retrieve the items by having someone contact the new owner on their behalf and request permission to recover the items from the attic. Such an attempt, however, would have increased the risk that law enforcement would be notified about the presence of the items in the attic.

---

[3] Defendants elected not to testify regarding the issue of abandonment.

11

It is reasonable to infer from the circumstances that Defendants decided that there was less risk of discovery by leaving the items concealed in the attic than there would be in attempting to retrieve them. These circumstances support a finding, by a preponderance of the evidence, that Defendants abandoned the cellular telephone and SSD drives after the house was sold and possession was transferred to the new owner in September 2017. Therefore, Defendants' Fourth Amendment rights were not violated by Officer Miller's search of the attic on July 12, 2018, or by the Government's subsequent search of the cellular phone and SSD drives pursuant to the search warrant issued on July 18, 2018.

### 2. Whether the search pursuant the July 18, 2018 warrant is so attenuated from the alleged illegality of the November 21, 2016 search that suppression of the evidence is not required.

The Government argues that even if the Defendants did not abandon the cellular phone and SSD drives found in the attic, the relationship between the November 21, 2016 search and the subsequent discovery and search of those devices is so attenuated that the evidence obtained from the devices should not be suppressed as "fruits" of the allegedly illegal search.

As stated in *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017), "[t]he exclusionary rule encompasses 'evidence seized during an unlawful search,' and also the 'indirect ... products of such invasions.' *Wong Sun*, 371 U.S. at 484, 83 S.Ct. 407. Evidence derivative of a Fourth Amendment violation—the so-called 'fruit of the poisonous tree,' *id.* at 488, 83 S.Ct. 407—is ordinarily 'tainted' by the prior 'illegality' and thus inadmissible, subject to a few recognized exceptions. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007)." Citing its decision in *United States v. Johns*, 891 F.2d 243 (9th Cir. 1989), the court further stated:

> We explained that evidence qualifies as the "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *Id.* (quoting *United States v. Chamberlin,* 644 F.2d 1262, 1269 (9th Cir.1980)). "The focus," in other words, "is on the causal connection between the illegality and the evidence." *Id.* (citation omitted). Because "[t]he illegal stop was the impetus for the chain of events leading to the marijuana," the marijuana evidence was inadmissible. *Id.* at 245–46. We also noted in *Johns* that "the burden of showing admissibility rests on the prosecution." *Id.* at 245 (quoting *Chamberlin*, 644 F.2d at 1269).


*Id.* at 716.

In this case, the November 21, 2016 search of the Burkehaven residence, led directly to the discovery of child pornography, and evidence of Defendants' alleged coercion, enticement and sexual exploitation of minor females. As a result, criminal charges were filed against the Defendants in early 2017 and they were detained pending trial. While in detention, Defendants' telephone calls were intercepted and monitored by the detention center and law enforcement. This led to the discovery of Defendants' communications with "E" in June and July 2017 which revealed that an item was concealed in the attic of the Burkehaven residence that Defendants wanted removed prior the residence's sale. The Government did not immediately pursue another search of the residence upon learning this information. However, when the current owner contacted the FBI in July 2018, Officer Miller promptly obtained his consent to search the attic and found the concealed electronic devices. The Defendants contend on this basis that the evidence obtained from the cellular telephone and SSD drives is the fruit of the November 21, 2016 search.

The Supreme Court has developed three exceptions to the "fruits of the poisonous tree" doctrine which allow the admission of evidence derived from official misconduct in some circumstances. *Gorman*, 859 F.3d at 718 (citing *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)). These exceptions are the "independent source doctrine," the "inevitable discovery doctrine," and the "attenuation doctrine." *Id.* (citing *Utah v. Strieff*, --- U.S. ---, 136 S.Ct. 2056, 2061 (2016)). The Government argues that the attenuation doctrine applies in this case, although the Court need not reach this issue if it finds that the devices were abandoned by Defendants. In evaluating whether the connection between an antecedent Fourth Amendment violation and subsequently discovered evidence is sufficiently attenuated to purge the taint, the court considers (1) the temporal proximity of the illegal conduct and the evidence in question, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. *Gorman*, at 718 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

. . .

1    The Government argues that the 20 month time span between the November 21, 2016 search of the Burkehaven residence and the July 2018 search of the electronic devices supports a finding of attenuation under the first prong. In support of the second prong, the Government argues that after the November 2016 search warrant was executed, Defendant Justin Fisher resided in the Burkehaven residence for five months before being taken into custody. After the Defendants were detained, additional months passed before Justin Fisher placed the Burkehaven residence on the real estate market, at which point Defendants asked "E" to remove the items before the residence sold. The Government again argues that Defendants could have asked their wives or others to remove the items but did not do so. The Government further argues that the new owner of house reached out to the FBI, unprompted, and gave Officer Miller permission to search the residence. *Government's Response* (ECF No. 119), at 9. Finally, the Government argues that there was no official misconduct related to the "New Search Warrant," i.e., the July 18, 2018 warrant to search the devices found in the attic. *Id.* at 10.

It is premature to decide whether the evidence obtained from the search of the electronic devices found in the attic are the "fruits of the poisonous tree" and whether the attenuation exception applies. First, the Court had not decided whether the November 16, 2016 search warrant was invalid. Second, the Government's argument regarding intervening circumstances is largely a repetition of its argument that Defendants abandoned the subject devices. If the items were, in fact, abandoned, then there is no Fourth Amendment issue with respect to the search of those items. Finally, the third prong of the attenuation doctrine focuses on the purpose and flagrancy of the official misconduct from which the poisonous fruits result—in this case, the November 16, 2016 search warrant. Again, the Court has not decided whether the November 16, 2016 search warrant was the result of intentional or reckless misrepresentations or omissions, or whether any such violation was flagrant.

. . .

. . .

. . .

. . .

## CONCLUSION

The Court finds that Defendants abandoned any possessory or privacy interest in the cellular telephone and SSD drives prior to their discovery and search by the Government. Therefore, the search of those items did not violate Defendants' Fourth Amendment rights. Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendants' Motion to Suppress Evidence Derived from Execution of Search Warrant and/or "Consent to Search" (ECF No. 117) be **denied.**

DATED this day of 14th day of December, 2018.

_____
**GEORGE FOLEY, JR.**
**UNITED STATES MAGISTRATE JUDGE**